## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ANTHONY JACKSON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:14-cv-01868-AJB** |
| **CAROLYN W. COLVIN,** | : | |
| *Acting Commissioner* | : | |
| *of Social Security,* | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[1]

Plaintiff Anthony Jackson ("Plaintiff") brought this action pursuant to

section 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3), to obtain judicial

review of the final decision of the Acting Commissioner of the Social Security

Administration ("the Commissioner") denying his application for Supplemental

Security Income Benefits ("SSI") under the Social Security Act.[2]  For the reasons

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated 7/13/14 & 7/15/14).  Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for federal Disability Insurance Benefits ("DIB").  42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for SSI benefits for the disabled.  Unlike Title II claims, Title XVI claims are not tied to the attainment of a particular period of

AO 72A
(Rev.8/8
2)

below, the undersigned **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.      PROCEDURAL HISTORY

Plaintiff filed an application for SSI on March 25, 2011, alleging disability commencing on August 1, 2006.  [Record (hereinafter "R") 61, 139].  Plaintiff's applications were denied initially and on reconsideration.  [*See* R61-62, 65-68, 70-73].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R74-77].  An evidentiary hearing was held on September 25, 2012, wherein Plaintiff's attorney amended the alleged onset date to February 1, 2011.  [R33-60].  The ALJ issued a decision on March 20, 2013, denying Plaintiff's application on the ground that he had not been under a "disability" at any time through the date of the decision.

---

insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).  Therefore, to the extent that the Court cites to DIB cases, statutes, or regulations, they are equally applicable to Plaintiff's SSI claims.

2

[R12-32].  Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on April 24, 2014, making the ALJ's decision the final decision of the Commissioner.  [R5-10].

Plaintiff then filed the present action in this Court on June 13, 2014, seeking review of the Commissioner's decision.  [*See* Doc. 1].  The answer and transcript were filed on October 29, 2014.  [*See* Docs. 8, 9].  On December 2, 2014, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 12], and on February 2, 2015, the Commissioner filed a response in support of the decision, [Doc. 17].[3]  The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. § 1383(c)(3).

---

[3]    The response brief was timely filed, pursuant to an Order granting the Commissioner's unopposed motion for extension of time.  [Doc. 16].  Plaintiff did not file a reply brief, and neither party requested oral argument.  (*See* Dkt.).

3

## II.    STATEMENT OF FACTS[4]

### A.    Background

Having a date of birth of November 15, 1969, Plaintiff was forty-one years old on the filing date of March 25, 2011, and forty-two years old on the date of the hearing before the ALJ.  [R40].  Plaintiff alleges that he is unable to work due to depression, anxiety, post-traumatic stress disorder ("PTSD"), and paranoia.  [R155, 170, 198, 208, 242].

### B.    Lay Evidence

#### 1.    Plaintiff's Testimony

Plaintiff testified that he completed the ninth grade, had been in special-education classes, and had dropped out because he could not pay attention.  [R44].  He also stated that although the record indicated that he had received a General Educational Development ("GED") credential, someone else had taken the test for him, and he could not have passed on his own.  [R41].  He also indicated that he could not read or write and that he tried to pay for things with dollar bills because he had difficulty

---

[4]       The facts stated herein are, in general, limited to those deemed relevant by the parties and the ALJ.  [*See* Doc. 9-2 at 15-27; Doc. 12; Doc. 17].

4

counting change.  [R41-42].  He stated that while he was in prison, he also took an anger-management class.  [R44].

Plaintiff stated that he had last worked in 2011, at a chicken plant, and that he worked only three days because he could not perform.  [R43].  He indicated that the work at the chicken plant took place while he was incarcerated and that while incarcerated, his work detail was trash collection.  [R44].  Plaintiff also reported that in 2004, between prison sentences, he worked for about one year at a construction job. [R45].  He indicated that he had not taken drugs since his most recent release in 2011. [R46].

5

Plaintiff reported that he was taking benztropine,[5] "perphenavine [sic],"[6] sertraline,[7] and trazodone[8] and that his sister organized the medication so that he could take it properly. [R50-51]. He stated that his medication calmed him and kept him from being frustrated, angry, and scared, but that he was unable to work because the medication also made him drowsy and kept him from being able to function. [R47-48, 52].

---

[5]    Benztropine (brand name, Cogentin) is commonly used to treat symptoms of Parkinson's disease or involuntary movements due to the side effects of certain antipsychotic drugs. WebMD, Benztropine, http://www.webmd.com/drugs/2/drug-8619/benztropine+oral/details (last visited 9/20/15).

[6]    This testimony appears to refer to perphenazine (brand name, Trilafon), a conventional antipsychotic that is typically used to treat the symptoms of schizophrenia. MedlinePlus, Perphenazine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682165.html (last visited 9/20/15).

[7]    Sertraline (brand name, Zoloft) is a selective serotonin uptake inhibitor ("SSRI") used to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and social-anxiety disorder. MedlinePlus, Sertraline, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited 9/20/15).

[8]    Trazodone is a serotonin modulator used to treat depression. MedlinePlus, Trazodone, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited 9/20/15).

6

AO 72A
(Rev.8/8
2)

Plaintiff testified that he lived with his mother and spent his days sleeping and watching television in his room.  [R47].  He reported that he did not help with the housework and that his mother did the cooking and laundry.  [R48].  He stated that he only went places with his sister, who would take him to appointments and show him where to go.  [R48].  He also indicated that he did not know how to type or use the Internet and that his sister composed e-mail messages for him.  [R48-49].

## 2.   *Counseling Notes*

On March 17, 2011, Plaintiff was referred to the DeKalb Community Service Board for treatment of depression and anger issues.  [R425].  Notes indicate that he had recently been released from prison after fifteen years of incarceration for drug possession and was on parole until August.  [R425].  It was also noted that Plaintiff received his GED in prison.  [R425].

Plaintiff presented for counseling at the MH Kirkwood unit of the DeKalb Community Service Board on March 23, 2011.  [R431].  Plaintiff reported auditory hallucinations and indicated that the conditions of his parole made him feel worthless, hopeless, and overwhelmed.  [R431].

At an appointment on April 1, 2011, Plaintiff reported feeling frustrated and angry and reported that the sources of his stress were being on probation, living with

7

his mother, and being unemployed. [R432]. He indicated that he had an ongoing conflict with his mother and resented her. [R432]. On April 22, 2011, Plaintiff again reported feeling frustrated and angry, this time due to his strained relationship with his daughter. [R433].

On May 6, 2011, Plaintiff reported a reduction in his symptoms of excessive worry and frustration and reported satisfaction with his prescribed psychotropic medication, saying, "It keeps me calm and I don't worry about stuff as much." [R434]. He also indicated that he was able to refocus, as he reported that he works on his mother's house and cuts her grass. [R434]. However, he also reported feeling stressed about money and his relationship with his kids; feeling paranoid; and sleeping with the lights on. [R434].

At a session taking place on June 22, 2011, Plaintiff reported feeling irritable and distrustful, particularly of his family members. [R437]. He indicated that the time he was incarcerated impacted his relationship with his children. [R437].

On July 7, 2011, Plaintiff reported a decrease in his feelings of anger and frustration and an increase in feelings of apathy. [R438]. He reported that his ankle monitor was recently removed but that he had allowed his frustration to result in an angry outburst toward his parole officer. [R438].

8

On July 21, 2011, Plaintiff reported feeling angry and frustrated about an ongoing conflict with his mother, with whom he still lived. [R439]. He stated that she did not want him to bathe or wash his clothes because he did not contribute financially to the household, but that he does "plenty around the house," including repairs, cleaning, and mowing the lawn, and he paid for the house. [R439].

Plaintiff continued to take his medications and participate in therapy, and in October 2011, he was assigned a new counselor, who was then reassigned less than a month later. [R513-14]. Plaintiff started with another new counselor in February 2012. [R521]. In the first session, Plaintiff reported that his medication was helping him relax, stay calm, not get so angry, and get about five hours of sleep. [R521]. He reported symptoms of anxiety about making child-support payments, not getting along with the mothers of his children, and not having a job due to his criminal history. [R521].

At counseling taking place on March 8, 2012, Plaintiff reported feeling used by his son and feeling overwhelmed about trying to find a job in light of his criminal history. [R523]. He reported that medication helped him reduce his feelings of frustration and anger but that he was taking his sleep medication during the daytime,

AO 72A
(Rev.8/8
2)

would not sleep with the light off, felt paranoid, and would isolate himself when overwhelmed. [R523].

At a visit on March 22, 2012, Plaintiff reported sleeping only one to two hours per night. [R524]. After exploring the reasons for the insomnia, the therapist suggested that he take his medication at 11:00 p.m., and Plaintiff agreed to do so. [R524]. They also discussed volunteer work that Plaintiff was required to do as part of a fatherhood program he was attending, and Plaintiff decided on volunteering for Habitat for Humanity. [R524].

At a counseling session taking place on April 17, 2012, Plaintiff reported feeling "good" and stated that he had been volunteering at Habitat for Humanity for the past seven days, completing anywhere from four to seven hours per day. [R525]. He also reported that his probation officer had allowed him to go to Kentucky to work on a ranch and earn some money. [R525]. He also reported that he was getting more sleep and going to bed at 11:00 p.m. five nights out of the week. [R525].

### C.    *Administrative Records*

An adult disability report dated March 25, 2011, indicates that Plaintiff could read and understand English but that he could not write more than his name in English. [R154]. It also shows that Plaintiff completed twelfth grade and did not attend

10

special-education classes.  [R156].  The report further indicates that at the time, Plaintiff was not taking any medication but was either receiving care or had an appointment scheduled for treatment of a mental condition. [R158].  The work-history section was left blank.  [R156-58].

An adult disability report dated April 29, 2011, states that Plaintiff can read and understand English and can write more than his name in English.  [R169].  The report also shows that Plaintiff completed twelfth grade and did not attend special-education classes.  [R171].  The report further indicates that at the time, Plaintiff was not taking any medication but was either receiving care or had an appointment scheduled for treatment of a mental condition.  [R172-73].  The job-history section was left blank. [R171-72].  A work-history report from that date was also left blank.  [R176-81].

In an adult function report dated May 4, 2011, Plaintiff reported that he lives in a house with his mother and that he watches television all day.  [R190, 194].  He indicated that he did not have any problems with his personal care and did not need any reminders to take medicine.  [R191-92].  He stated that he did not prepare food because "it's poison" and that he never does housework or yardwork.  [R192].  He also reported that his sister and mother did his shopping and his sister paid his bills.  [R193].  He stated that he did not go anywhere or spend time with anyone on a regular basis.

11

[R194].  He indicated that he could pay attention "all the time" and was good at following written and spoken instructions.  [R195].

In an adult disability report dated August 19, 2011, Plaintiff reported that his sister helped him with personal needs such as picking out his clothes and cooking his food. [R211].  He also stated that he had been struggling with PTSD and paranoia, was depressed "all the time," had anxiety attacks, and could not sleep with the light off.  [R211].  He further stated that he was always afraid that someone was watching him and trying to get him, that he did not go anywhere and instead stayed in the house, and that the only places he goes are to his therapist and doctor.  [R211].

### D.   School Records

Notes from a meeting held on or about May 9, 1983, indicate that Plaintiff had been attending special-education classes and had mastered his goals for the 1982-83 school year.  [R545].  It was recommended that Plaintiff be placed in a regular classroom the following year.  [R545].

### E.   Medical Records

Notes from an intake mental-health screening and assessment taking place at the Correctional Medical Service on August 3, 2006, indicate that Plaintiff was of average

12

cognitive functioning; had completed the tenth grade; was oriented to person, place, and time; and did not appear to have any mental-health problems.  [R260].

An inmate-worker screening sheet dated September 12, 2006, indicated that Plaintiff had no behavioral or mental-health problems that might impair performance. [R261].  He was cleared to work without limitation.  [R261].

Notes from an intake mental-health screening and assessment taking place at MHM Correctional Services on February 26, 2008, indicate that Plaintiff was of average cognitive functioning; had completed a GED; was oriented to person, place, and time; and did not appear to have any mental-health problems.  [R282].

Notes from an intake mental-health screening and assessment taking place at MHM Correctional Services on November 4, 2008, indicate that Plaintiff was of average cognitive functioning; had a twelfth-grade education; was oriented to person, place, and time; and did not appear to have any mental-health problems.  [R297]. Shortly thereafter, Plaintiff was cleared for work without limitations.  [R298].

A medical-information transfer form completed by the Georgia Department of Corrections on July 26, 2009, indicated that Plaintiff was not taking any medication and had no mental-health problems.  [R294].  Notes dated July 27, 2009, indicate that Plaintiff was oriented to place, person, time, and situation; had no signs of

13

hallucinations, delusional thinking, depression, or mania; had adjusted well to previous incarcerations; had no history of mental-health treatment; had completed the eleventh grade and received a GED; and did not desire mental-health treatment. [R361-64].

A mental-retardation[9] screening conducted on August 18, 2009, while Plaintiff was incarcerated, resulted in a score of 70 on the Wechsler Abbreviated Scale of Intelligence ("WASI"). [R355]. The score was noted to fall in the "borderline" range, and it was determined that Plaintiff did not require mental-health or mental-retardation services based on intellectual functioning. [R355]. The records also indicate a verbal IQ score of 64 and a performance IQ score of 81 and note that Plaintiff completed the tenth grade, had a GED, and was in special education in sixth grade because he was a "slow learner." [R356]. It was also noted that Plaintiff was persistent in the testing, "often working well past time limits until successfully completing task";

---

[9]    On August 1, 2013, while Plaintiff's appeal of the ALJ's decision was before the Appeals Council, the Social Security Administration amended Listing 12.05 to replace the words "mental retardation" with "intellectual disability" because of the negative connotations associated with the term "mental retardation." *See* 78 Fed. Reg. 46,499, 46,501. The change went into effect on September 3, 2013, and "does not affect the actual medical definition of the disorder or available programs or services." *Id*. at 46,499-46,500. For the sake of accuracy, where the term "mental retardation" is used in the medical records or by the ALJ, the Court will use that terminology. Otherwise, the Court will use the term "intellectual disability." In any event, the terms are to be read interchangeably.

14

AO 72A
(Rev.8/8
2)

was pleasant; had good attention and concentration; had no apparent language deficits; had "okay" comprehension; was in a euthymic mood with an appropriate affect; and was future oriented and optimistic. [R360].  Notes also indicate that Plaintiff "stays to himself" and reads.  [R360].  He was observed to have no symptoms of psychosis and reported no problems.  [R360].

On March 17, 2011, Plaintiff presented to the DeKalb Community Service Board with complaints of moderate anxiety, moderate depression, moderate delusions, moderate inappropriate expressions of anger; and mild substance abuse, all of which he reported had been a chronic problem for many years.  [R366, 425].  Plaintiff reported stress about finding employment with his criminal background; he indicated that he had been dealing with depression most of his life, his mother was an alcoholic, he was paranoid and felt that people were watching him, and he had problems with physical aggression; and he stated that he had been charged with cocaine possession. [R366].  It was noted that Plaintiff had recently been released from prison after serving fifteen years for drug possession and that his symptoms included depression, headache, lack of sleep, hearing voices (command), irritability, and agitation.  [R425].  The

15

medical provider assessed depressive-type psychosis and assigned a Global Assessment of Functioning ("GAF") score of 50.[10]  [R424].

On April 22, 2011, Plaintiff presented to Neha A. Khurana, M.D., of the MH Kirkwood unit of the DeKalb Community Service Board, for a psychiatric evaluation.  [R429].  Dr. Khurana's notes indicate that Plaintiff complained that he did not "feel like being around people no more" and that he reported having no prior psychiatric history or treatment.  [R429].  Plaintiff reported that he had recently been released from a ten-year prison sentence and was still wearing an ankle monitor and was under curfew at his mother's house, all of which frustrated him.  [R429].  Plaintiff also reported that he had been in special-education classes in school and dropped out after the eighth grade.  [R429].

Dr. Khurana opined that Plaintiff's paranoia could be explained as hypervigilence and behavior learned on the street and in prison and that he did not need

---

[10]     The GAF is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR").  A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

16

antipsychotic medication. [R430]. She also found that Plaintiff was depressed, and she started him on Zoloft. [R430].

Plaintiff returned to Dr. Khurana on April 26, 2011. [R426]. Plaintiff was assessed with major depressive disorder, single episode severe, and cocaine dependence, in remission, and was assigned a GAF score of 45. [R426].

At an appointment taking place on May 20, 2011, Plaintiff reported that his mood was better and that he was less hypervigilant but still suspicious of his mother and still having financial and sleeping problems. [R436]. Dr. Khurana assessed major depressive disorder, single episode severe, and cocaine dependence, in remission; assigned a GAF score of 55[11]; continued Plaintiff's Zoloft; and added trazodone to target insomnia. [R428, 436].

A consultative examination was administered on July 28, 2011, by Cheryl Gratton, Ph.D. [R405-09]. During the examination, Plaintiff indicated that he quit school after the eighth grade and had been enrolled in a special-education curriculum, which Dr. Gratton noted was in conflict with the educational-history information

---

[11]      A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

17

submitted on the state-agency application forms.  [R405].  Plaintiff reported inability to work due to depression and paranoia secondary to having been in prison for fifteen years.  [R405].  He indicated that in the past, he had worked at a dishwashing job and a construction job each for one year and that he last worked at a chicken-processing plant for three days while in prison but discontinued the job because it "messed up" both of his hands.  [R406].

Plaintiff reported that he was living with his mother and stated that his sister "takes care of him."  [R406].  He indicated that he did little more each day than staying in the house and watching television; he could not so much as make a sandwich for himself; he could not read; he could bathe and dress himself but did not know how to comb his hair; he did not know how to pay bills or manage finances; he was no longer able to drive; he claimed a history of auditory and visual hallucinations since age ten; and he claimed that he heard voices telling him to hurt himself.  [R406].  Dr. Gratton opined that Plaintiff's portrayal of his activities of daily living was not realistic and appeared to be significantly under-reported.  [R406].

On mental status examination, Dr. Gratton observed that Plaintiff's affect was flat.  [R407].  His mentation was "characterized by slowing that appeared to be feigned."  [R407].  Plaintiff was not able to comprehend abstraction, his memory

function appeared impaired, and his speed at task performance was deficient, though Dr. Gratton found his effort to be "questionable in the extreme." [R407]. Plaintiff's attentional capacity appeared impaired during testing, though Dr. Gratton stated it was normal during the interview portion. [R407]. Dr. Gratton opined that Plaintiff was not a reliable historian; that he appeared to malinger, embellish symptoms, and minimize his strengths; and that his test results were not consistent with clinical presentation. [R407].

On the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), Plaintiff scored 50 on Verbal Comprehension; 50 in Perceptual Reasoning; 50 on Working Memory; and 50 on Processing Speed; and his Full Scale IQ was 40. [R407-08]. On the Wide Range Achievement Test – Third Edition ("WRAT-III"), he obtained a Standard Score of less than 45 on the Reading subtest and a Standard Score of less than 45 on the Arithmetic subtest. [R408]. The Rey Malingering Memory Test and the Test of Memory Malingering showed evidence of extreme malingering. [R408].

Dr. Gratton diagnosed malingering and cocaine dependence, declined to make a mental diagnosis on Axis II, and declined to assess a GAF score. [R409]. Dr. Gratton found that Plaintiff's IQ was in the "Defective" range, but that his "frank, flagrant, and

19

egregious malingering indicates that this is a significant under-estimate of his actual level of functioning." [R409]. Dr. Gratton further opined that based on the results of her assessment, Plaintiff "finds it easy to comprehend and carry out simple instructions when he is motivated to do so," "[h]is attention is sufficient for the execution of tasks he wishes to perform," and he "is possibly likely to be challenged by difficulties getting along with others, especially those in positions of authority." [R409]. Dr. Gratton also opined that Plaintiff "would not be likely to decompensate under stressful conditions unless significant secondary gain were available to him." [R409].

In a Psychiatric Review Technique ("PRT") form dated August 9, 2011, nonexamining state agency physician Anna J. Williams, Ph.D., opined that Plaintiff's impairments were not severe. [R410, 422]. She also opined that Plaintiff was only mildly restricted in activities of daily living; had mild difficulties in maintaining social functioning; and had mild difficulties in maintaining concentration, persistence, or pace. [R420].

Plaintiff presented to Shahina Mirza, M.D., at the MH Kirkwood unit of the DeKalb Community Service Board on August 11, 2011. [R440]. Dr. Mirza's notes indicate Plaintiff reported that was afraid to leave the house because he was afraid he would be hurt and that he was afraid to go to sleep and slept with the lights on because

AO 72A
(Rev.8/8
2)

he believed someone was watching him all the time.  [R440].  Dr. Mirza also noted that

since Plaintiff's release from prison, he had been treated with antidepressants and had

not received medication for his paranoia.  [R440].  Dr. Mirza opined that Plaintiff had

paranoid thoughts that interfered with his daily life routines in that he did not leave the

house, stayed isolated, and slept only with the lights on.  [R440].  She continued

Plaintiff's Zoloft and trazodone and started him on a "small dose" of Trilafon.  [R440].

On September 15, 2011, non-examining state agency review physician Cristina

Grand, Psy.D., completed a Mental Residual Functional Capacity ("RFC") Assessment.

[R445-48].  Dr. Grand opined that Plaintiff was moderately limited in his abilities to:

understand and remember detailed instructions; complete a normal workday and

workweek without interruptions from psychologically based symptoms; perform at a

consistent pace without an unreasonable number and length of rest periods; interact

appropriately with the general public; accept instructions and respond appropriately to

criticism from supervisors; get along with coworkers or peers without distracting them

or exhibiting behavioral extremes; and respond appropriately to changes in the work

setting.  [R446].  Dr. Grand further opined that Plaintiff was adjusting to society after

release from prison and that the evidence seemed to indicate that Plaintiff was

exaggerating and malingering mental illness.  [R477].  She found that Plaintiff was

21

capable of simple tasks, and she recommended limited social contact.  [R447].  That same day, Dr. Grand completed a PRT form in which she opined that Plaintiff had mild restriction in his activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  [R459].

On September 19, 2011, Dr. Mirza completed a Medical Source Statement. [R468-70].  In it, Dr. Mirza opined that Plaintiff had poor or no ability to follow rules; deal with the public; interact with supervisors; deal with work stress; function independently; maintain attention and concentration; and understand, remember, and carry out simple job instructions.  [R468-69].  Dr. Mirza further opined that Plaintiff was seriously limited in his abilities to relate to co-workers; use judgment; maintain personal appearance; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability.   [R468, 470].   Dr. Mirza wrote in explanation that Plaintiff was paranoid and unable to relate to others; he felt uncomfortable around others; he took medication for depression; and paranoid thoughts interfered with his concentration.  [R469].

Notes from a visit with Dr. Mirza on December 12, 2011, indicate that Plaintiff reported that his medications were helping him to stay calm and to interact with others

22

without getting agitated.  [R520].  He stated that he was still living with his mother and having money problems and that he had been "working with church people" and was involved with a fatherhood program.  [R520].  Dr. Mirza continued Plaintiff's Zoloft, Trilafon, and trazodone; recommended that he continue with supportive therapy; and told him to make a follow-up appointment after three months.  [R520].

Plaintiff returned for follow-up with Dr. Mirza on March 1, 2012.  [R522].  He reported that with the addition of Trilafon, he was feeling less paranoid but was still afraid of someone assaulting him in his sleep.  [R522].  He denied having side effects from his medication and reported that was able to attend to his activities of daily living.  [R522].  Dr. Mirza increased Plaintiff's Trilafon dosage and continued him on Zoloft and trazodone.  [R522].

Plaintiff returned to Dr. Mirza on June 4, 2012.  [R526].  He reported feeling paranoid and that someone was watching him all the time, and he indicated that he had disturbed sleep on some days.  [R526].  He stated that he stayed home most of the time and was involved in volunteer work at Habitat for Humanity.  [R526].  Dr. Mirza increased Plaintiff's dose of Trilafon and continued his Zoloft and trazodone.  [R526].

A DeKalb Community Service Board Physician Therapy Note dated September 5, 2012, indicates "overt psychotic symptoms with paranoid ideation" and

AO 72A
(Rev.8/8
2)

side effects from anti-psychotic medication. [R517]. Medications included Trilafon, Zoloft, trazodone, and Cogentin. [R517]. Plaintiff was diagnosed with major depressive disorder, single episode moderate; cocaine dependence, unspecified; and rule out paranoid psychosis; and assigned a GAF score of 55. [R527].

On October 2, 2012, Maria Johnson, M.D., of Kirkwood Mental Health saw Plaintiff for the first time and completed the same Medical Source Statement form Dr. Mirza had completed in September 2011. [R556, 560; *compare* R468-70 *with* R553-55]. She stated that Plaintiff had last been seen on September 5, 2012, "by another provider." [R556]. Like Dr. Mirza, Dr. Johnson opined Plaintiff had poor or no ability to follow rules; deal with the public; interact with supervisors; deal with work stress; function independently; maintain attention and concentration; or understand, remember, and carry out simple job instructions. [*Compare* R468-70 *with* R553-55]. Dr. Johnson further opined that Plaintiff had poor or no ability to relate to coworkers; use judgment; behave in an emotionally stable manner; relate predictably in social situations; or demonstrate reliability. [R554-55]. Dr. Johnson also opined that Plaintiff was seriously limited in his ability to maintain his personal appearance. [R555]. Dr. Johnson indicated that the limitations resulted from Plaintiff's social anxiety,

24

paranoia, anger, memory problems, and flashbacks, and that the limitations had existed at the reported level of severity since January 1, 2007.  [R554-55].

Dr. Johnson opined that Plaintiff suffered from bipolar syndrome characterized by, *inter alia*, moderate restriction of activities of daily living; extreme difficulties in maintaining social functioning; extreme deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere); and four or more repeated episodes of decompensation, each of extended duration. [R558]. Dr. Johnson noted that Plaintiff's functional limitations included low energy, sadness, crying, low motivation, headaches, negative thoughts, and thoughts of suicide; that he had poor memory, comprehension, paranoia; and that he appeared irritable, defensive, tense, and easily angered.  [R559].  Dr. Johnson also indicated that Plaintiff suffered from PTSD and depression, separate and apart from any history of drug or alcohol use.  [R560].

### F.    *Vocational-Expert Testimony*

The vocational expert ("VE") testified that Plaintiff's last work was a laborer job and that it was classified as heavy and unskilled.  [R53].  She also testified that a person of Plaintiff's age, education, and work experience, who is limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements and

AO 72A
(Rev.8/8
2)

involving only simple work-related decisions, with few, if any, workplace changes, and is capable of only occasional, casual interaction with the public, coworkers, and supervisors, could perform work as a laborer, which was a job Plaintiff had previously performed, and could alternatively work as a buckle-wire inserter, racker, or box bender.  [R53-55].

Upon further questioning, the VE testified that the alternative jobs of buckle-wire inserter, racker, and box bender were isolated jobs but that they required more than casual contact with supervisors.  [R55].  She also testified that if the hypothetical person had psychologically based symptoms that caused him to occasionally exhibit an inability to maintain concentration, persistence and pace, he would be precluded from performing those jobs.  [R56].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since March 25, 2011, the application date (20 CFR 416.971 *et seq.*).

. . .

2.    The claimant has the following severe impairment: depressive disorder with psychosis (20 CFR 416.920(c)).

. . .

26

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

. . .

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is restricted to work that is limited to simple, routine, and repetitive work tasks or instructions; that does not require close coordination or interaction with supervisors, co-workers, or the general public; that is low stress (only occasional decision-making and changes to work setting); and that is no[t] production-paced.  The work must be isolated with rare interaction with other people.

. . .

5.     The claimant may be capable of performing past relevant work as a laborer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

. . .

6.     The claimant has not been under a disability, as defined in the Social Security Act, since March 25, 2011, the date the application was filed (20 CFR 416.920(f)).

[R17-27].

27

The ALJ explained that although Dr. Mirza was a treating physician of long standing and her opinion had some foundation in Plaintiff's complaints, she assigned Dr. Mirza's opinions "little weight" because they were not justified by the medical evidence of record: no mental impairments were mentioned or treated when Plaintiff was incarcerated; Plaintiff reported feeling better within two months of starting Zoloft; and two months after that, he underwent a consultative examination where he malingered during the testing, showed good concentration and attention both in his malingering and during the interview, and showed ability to follow instructions; Plaintiff reported relief from increased Trilafon shortly after Dr. Mirza issued her opinion, and within the next few months, Plaintiff was able to work with church people and in a group program, work at a ranch, and volunteer at Habitat for Humanity. [R23-24].

The ALJ additionally found that Plaintiff's ability to live with his mother showed that he could deal with stress and difficult relationships. [R23]. The ALJ also acknowledged the low GAF scores but noted the Commissioner's position that GAF scores have no direct correlation to the severity requirements of the mental-disorder listings. [R24]. She also stated that although she found the opinions of the state-agency reviewing physicians to be "well-reasoned, supported by the medical

28

evidence of record as a whole, and substantively consistent with other opinions," she did not rely on the opinions but instead independently reviewed the record. [R25].

The ALJ also stated that she had considered whether the record indicated that Plaintiff was mentally retarded, and she explained that although Plaintiff's score on the WAIS-IV administered by Dr. Gratton was indicative of severe mental retardation and the intelligence testing administered while Plaintiff was in prison could implicate the mental retardation listing, she found that Plaintiff's condition did not meet or medically equal the listing because: Plaintiff's WAIS-IV score was invalidated by malingering; the testing done in prison was not a full intelligence test, and the wide scattering of scores supported a finding that Plaintiff was merely learning disabled; a finding that Plaintiff was not mentally retarded was consistent with Plaintiff's individualized education plan, which allowed for only one resource class in reading each week; and his activities—such as his proficiency as a "drug salesman" and his ability to obtain a GED, perform repairs, and maintain intimate relationships—showed that he had adaptive abilities generally not associated with mental retardation. [R24-25].

Finally, the ALJ qualified her determination that Plaintiff "may" be capable of performing past relevant work as a laborer, explaining that she was concerned that Plaintiff was not able to perform his past relevant work because it might require him

29

to work around hazards but that he was capable of performing alternative work including buckle inspector, racker, and box bender.  [R25-26].

## IV.  STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).  The Commissioner uses a five-step

AO 72A
(Rev.8/8
2)

sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that

AO 72A
(Rev.8/8
2)

there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## V.  SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court

32

may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

   "Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary

33

of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff raises the following allegations of error: (1) that the ALJ erred at step two of the five-step evaluative process when she did not find that Plaintiff suffered from a severe cognitive disorder; (2) that Plaintiff should have been found to meet Listing 12.05 (Intellectual Disability); (3) that the ALJ did not properly evaluate the medical opinions; (4) that the RFC did not accommodate the ALJ's determination that Plaintiff had "moderate" difficulties with regard to concentration, persistence, or pace; (5) that the ALJ erred when she found Plaintiff capable of past work as a laborer; and (6) that the Commissioner did not meet her burden of showing that there was other work Plaintiff could perform. The Court addresses the allegations in their logical order.

AO 72A
(Rev.8/8
2)

### A.      Step-Two Finding

Plaintiff first argues that the ALJ erred when she did not find at step two that a cognitive disorder was among Plaintiff's severe impairments.  [Doc. 12 at 9-10].  The Court finds no reversible error in the omission.

"[T]he finding of any severe impairment . . . is enough to satisfy step two," *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987), and "[n]othing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe," *Heatly v. Comm'r of Soc. Sec.*, 382 Fed. Appx. 823, 825 (11th Cir. June 11, 2010) (per curiam).  The ALJ found in Plaintiff's favor at step two by determining that he had the severe impairment of depressive disorder with psychosis and proceeding with the sequential evaluation process.  [R17-25].  Thus, to the extent that the ALJ erred at step two by failing to acknowledge that Plaintiff also suffered from a severe cognitive disorder, the error is harmless.

### B.      Concentration, Persistence, or Pace

Plaintiff also contends that the ALJ failed to follow precedent established in *Winschel v. Commissioner of Social Security*, 631 F.3d 1176 (11th Cir. 2011), when she found Plaintiff to have "moderate" difficulties with regard to concentration, persistence,

35

or pace, [R18], yet found him capable of understanding, remembering, and carrying out simple, routine, repetitive tasks, [R19].  [Doc. 12 at 13].

Plaintiff does not elaborate on his assertion, and having reviewed the RFC in light of *Winschel*, the Court finds that the argument is inapposite here.  *Winschel*'s holding makes clear that an RFC finding and hypothetical question must account for the claimant's moderate limitations in concentration, persistence, and pace, and establishes that simply restricting the RFC and hypothetical question to simple, routine tasks or unskilled work does not sufficiently account for limitations in concentration, persistence, and pace. *See Winschel*, 631 F.3d at 1080-81.  Here, however, the ALJ not only limited Plaintiff to simple, routine, and repetitive work, but also accounted for his limitations in concentration, persistence, and pace by further limiting him to work that is low stress and that is not production paced.  [R19; *see also* R53 (limiting work to "simple, routine, repetitive tasks in a work environment free of fast-pace production requirements, involving only simple work-related decisions, with few, if any, workplace changes")].   Accordingly, the undersigned concludes that Plaintiff's argument that the RFC finding does not comply with *Winschel* is without merit.

36

## C.    *Opinion Evidence*

The Court next turns to Plaintiff's contention that the ALJ erred when she gave "little weight" to the opinion of Dr. Mirza and did not discuss Dr. Johnson's opinion. [*See* Doc. 12 at 13-16].  Plaintiff refers to both of the opinions as opinions of treating physicians and argues that the ALJ was required to give the opinions substantial weight or show good cause for declining to do so but that she instead impermissibly took on the role of physician.  [*Id.* at 13-16].  Defendant, in turn, argues that the ALJ showed good cause for giving little weight to Dr. Mirza's opinion; that Dr. Johnson was merely a one-time examiner and her opinion therefore was not entitled to deference; and that the Court can determine that the ALJ's conclusions are rational and supported by substantial evidence even lacking any discussion of Dr. Johnson's opinion. [Doc. 17 at 13-21 & n.2].

The Commissioner must evaluate every medical opinion the agency receives, regardless of the source.    20   C.F.R.   §§   404.1527(c),   416.927(c); *cf.* 20 C.F.R. §§ 404.1527(b), 404.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the

37

available evidence in the individual's case record in every case.").   Thus, treating,

non-treating, and even non-examining sources provide opinion evidence for the ALJ

to consider in rendering a decision.  20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e).  In

determining the weight of medical opinions, the ALJ must consider: (1) the examining

relationship; (2) the treatment relationship; (3) the degree to which the medical source

presented evidence supporting the conclusions; (4) the consistency of the opinion with

the record as a whole; (5) the medical expert's area of specialty; and (6) other factors,

including the amount of understanding of disability programs and the familiarity of the

medical    source    with    information    in    the    claimant's    case    record.

20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

   The opinion of a treating physician must be given substantial or considerable

weight unless "good cause" is shown to the contrary.  *Winschel*, 631 F.3d at 1178-79;

*Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  Good cause exists when:

(1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence

supported a contrary finding; or (3) the treating physician's opinion was conclusory or

inconsistent with the doctor's own medical records.  *Phillips*, 357 F.3d at 1241.  When

electing to disregard the opinion of a treating physician, the ALJ must clearly articulate

legitimate reasons for doing so.  *Id.*

AO 72A
(Rev.8/8
2)

In contrast, a one-time examining physician's opinion is not entitled to great weight. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (per curiam). Nevertheless, in rejecting a one-time examining physician's opinion, the ALJ is required to "state with particularity" the weight given to the opinion "and the reasons why." *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir. Jan. 25, 2006) (per curiam). Additionally, where an ALJ does not give controlling weight to a treating source, she must explain the weight given to the opinions of the reviewing physicians. *Id.* at 419.

Having carefully reviewed the ALJ's decision, the undersigned finds reversible error not only in the ALJ's handling of Dr. Mirza's and Dr. Johnson's opinions but also in her treatment of myriad other portions of the medical evidence.

To be sure, Plaintiff has not shown evidence that would allow the Court to conclude that Dr. Johnson is a treating source. A treating source is an individual who provides the claimant with medical treatment or evaluation and who has an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. The record does not establish that Dr. Johnson had any sort of an ongoing treatment relationship with Plaintiff. As far as the undersigned can determine, the only references to Dr. Johnson are in the medical records dated October 2, 2012. [*See* R553-60]. This apparent lack

39

of a treating relationship forecloses a finding that Dr. Johnson served as a treating physician. *See Misuraca v. Sec'y of Health and Human Servs.*, 562 F. Supp. 243, 246 (E.D.N.Y. 1983).

The Court also recognizes that other courts have held that a doctor who is member of a medical treatment team may be a treating doctor when she transmits her own knowledge and opinion and those of the medical treatment team under her supervision. *See, e.g., Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1039 (9th Cir. 2003). Here, there is also no evidence upon which to base a determination that Dr. Johnson was part of Plaintiff's treatment team. As stated above, there is no medical record evidence that Dr. Johnson examined or treated Plaintiff on any day prior to the day she rendered her medical opinion. Also, there is no evidence that Dr. Johnson was associated with or had any contact with Plaintiff's treatment team or those doctors who oversaw Plaintiff's treatment. Nor is there even any evidence that Dr. Johnson reviewed Plaintiff's treatment record. As a result, the undersigned concludes that there is insufficient evidence to determine that Dr. Johnson is part of a treatment team. *Cf. Kittleson v. Astrue*, 533 F. Supp. 2d 1100, 1116-17 (D. Or. 2007) (finding doctor was treating doctor where he treated plaintiff briefly, was responsible for plaintiff's continuing care, and had direct contact with members of plaintiff's treatment team);

40

*Moser v. Barnhart*, No. Civ. 01-279(JRT/AJB), 2002 WL 459052, at *3 (D. Minn. Mar. 18, 2002) (finding no treating relationship because, although plaintiff went to doctor's clinic for twenty-five years, there was no evidence that the doctor reviewed plaintiff's record or was involved in claimant's treatment).  Accordingly, Plaintiff has failed to show that Dr. Johnson's opinion is entitled to the deference due a treating source.

Be that as it may, Plaintiff raises other valid concerns about the ALJ's handling of the medical evidence.  First, while it is true, as Defendant points out, that the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs, *see Revised Med. Criteria for Evaluating Mental Disorders & Traumatic Brain Injury*, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000) (noting that the scale "does not have a direct correlation to the severity requirement in our mental disorders listings"), and that Plaintiff failed to supply any legal authority showing that GAF scores are entitled to deference, [*see* Doc. 12 at 15], the Court finds no basis for a determination that the GAF scores are wholly irrelevant, as the ALJ in effect found, [*see* R24 (describing GAF scores as of "dubious applicability to the claimant's social and occupational functioning" and giving them no further consideration)].  Indeed, the Eleventh Circuit has held—albeit in an unpublished opinion—that failure to consider

41

GAF scores in the range assigned to Plaintiff is not harmless error. *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. Jan. 25, 2006) (holding that the ALJ's misinterpretation of a GAF score of 45 as reflective of moderate symptoms and his failure to consider a GAF score of 48 was not harmless error because these scores reflected severe impairments, requiring the ALJ to determine what weight to give to the GAF scores). Thus, this circuit's authority suggests that an ALJ is not bound by GAF scores in determining a claimant's RFC but that the ALJ's decision must indicate that the ALJ considered any GAF scores, show what weight the ALJ assigned to the scores, and provide a substantive reason why such weight was given. Accordingly, the undersigned finds that the matter is due to be reversed and remanded for further consideration and weighting of Plaintiff's GAF scores and the impact of that consideration on the ALJ's weighting of all of the opinion evidence.

Second, the ALJ's analysis is permeated by the ALJ's impermissible presumption of the role of a medical expert. As Plaintiff points out, an ALJ may not assume the authority to act as both judge and physician because, as a layperson, an ALJ is not qualified to interpret the medical reports and findings. [Doc. 12 at 16 (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1991) (per curiam) (Johnson, J., concurring); *Cole-Smith v. Astrue*, 2:11-CV-2857-VEH,

42

2012 WL 1946766, at *6 (N.D. Ala. May 29, 2012))].  *See also Hillsman v. Bowen*, 804 F.2d 1179, 1182 (11ᵗʰ Cir. 1986) (holding that the Commissioner may not reject the opinion of a treating physician simply because the ALJ "reached a different conclusion after reviewing the medical records").  Nevertheless, in this case, the ALJ makes numerous determinations that require medical expertise without citing any basis for her conclusions, such as determining that the IQ scores obtained from testing in prison were unreliable because "the testing was only a brief test, and not the full intelligence test" and because "[t]he wide scattering of scores also supports a learning disability, rather than mental retardation," [R24]; stating generally that abilities to make repairs and maintain intimate relationships "are generally not associated with mental retardation," [R25]; and most curiously, stating that "[e]ven though the opinions of the State Agency non-examining medical consultants are well-reasoned, supported by the medical evidence of record as a whole, and substantively consistent with the other opinions," the ALJ "does not rely on these opinions, but independently evaluates the record." [R25].  As a layperson, the ALJ—like this Court—is not qualified to render an opinion on whether the WAIS methodology is sufficient to produce valid IQ scores; whether the range of IQ test results has any significance as to whether Plaintiff has borderline intelligence or is intellectually disabled; or whether a person may have an intellectual

43

disability yet still be able to make repairs and maintain intimate relationships; and it is entirely unclear why the ALJ would be more competent to evaluate the medical record than the state-agency reviewing physicians. Rather, these are issues requiring input from a medical expert. Moreover, as the WAIS testing resulted in IQ scores in the intellectual-disability range and reviewing physician Dr. Grand opined that Plaintiff was moderately limited in his abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, [R446], it appears that the ALJ's mishandling of the evidence may not have been harmless.

Third, the ALJ's explanation that Plaintiff's activities are in conflict with Dr. Mirza's opinion appears to significantly overstate the evidence actually in the record. As Plaintiff points out, the ALJ found that Plaintiff does not have mental retardation based, in part, on his ability to "maintain[] intimate relationships," yet the ALJ did not cite any record evidence showing that Plaintiff maintained intimate relationships. [Doc. 12 at 15 [citing R25]]. The Court finds no such evidence in the record, and the Commissioner does not point to any, and indeed, does not acknowledge or try to explain the omission. [*See* Doc. 17, *passim*]. Somewhat similarly, the ALJ points to a psychotherapy record as evidence that Plaintiff's condition was improving,

44

as he was "working with people from church and involved in a group program," but does not acknowledge that, in context, the involvement with the groups appears to stem from Plaintiff's adaptive issues:  "[H]e lives with his mother and is worried about his child support problem as he has no source of income . . . .  He has been working with church people and at present he is involved with [a] fatherhood program."  [R520].  As previously noted, in order to determine that the ALJ's decision was supported by substantial evidence, it must be clear the that ALJ took into account evidence both favorable and unfavorable to her opinion.  *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (holding that an administrative decision is not supported by "substantial evidence" where the ALJ acknowledges only the evidence favorable to the decision and disregards contrary evidence).  Thus, upon remand, the ALJ should also reconsider whether there are evidentiary grounds for these findings.

Finally, the ALJ's disregard of Dr. Johnson's opinion may have been considered harmless error had the ALJ properly evaluated Dr. Mirza's opinion and the other medical evidence, as the ALJ had given little weight even to Dr. Mirza's less-restrictive opinion; there is no evidence that Dr. Johnson had a treating relationship with Plaintiff; and Dr. Johnson's opinion does not include any description of the examination or medical-record review Dr. Johnson may (or may not) have conducted.  Nevertheless,

45

upon remand, the ALJ should consider Dr. Johnson's opinion along with all of the other relevant medical evidence, and, should she find that the opinion is due to be discounted or rejected, fulfill her obligation to "state with particularity" the weight given to the opinion "and the reasons why." *McCloud*, 166 Fed. Appx. at 418-19.

### D.    Listing 12.05 (Intellectual Disability)

Plaintiff also takes issue with the ALJ's determination that he did not meet Listing 12.05C.  [Doc. 12 at 10-11].  The Listing of Impairments in Appendix 1 of Subpart P describes for each of the major body systems impairments that are considered to be severe enough to render an individual disabled.  20 C.F.R. § 404.1525(a).  As noted above, at the third step of the five-step disability evaluation process, the ALJ must determine whether a claimant's impairments meet or equal one of the Listings and meet the duration requirement.[12]  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant meets or equals a Listing, then he is disabled.  *Id.*

A claimant meets a Listing if he has a diagnosis included in the Listings and provides medical reports documenting that his conditions meet the specific criteria in the Listings.  *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (per curiam)

---

[12]    An impairment "must have lasted or must be expected to last for a continuous period of at least 12 months" to meet the duration requirement. *See* 20 C.F.R. § 404.1509.

AO 72A
(Rev.8/8
2)

(citing 20 C.F.R. § 404.1525(a)-(d)).   A claimant equals a Listing if the medical findings show an impairment at least equal in severity and duration to the criteria set out in the Listing. *Wilson*, 284 F.3d at 1224.  Where a claimant alleges that he has an impairment that meets or equals a Listing, he bears the burden of presenting evidence showing how his impairment meets or equals the Listing. *Wilbon v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 826, 828 (11th Cir. May 18, 2006) (per curiam) (citing *Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (per curiam)).

Listing 12.05 (Intellectual Disability) refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period—that is, the evidence demonstrates or supports onset of the impairment before age 22.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  The required level of severity for subsection C is met when the claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*.  Thus, a claimant meets Listing 12.05C if he shows: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22 ("adaptive-deficit requirement"); (2) a valid IQ score between 60 and 70 ("IQ-score requirement"); and (3) other physical or mental impairments that impose

47

significant work-related limitations ("other-impairment requirement").  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00A, 12.05C; *Gibson v. Astrue*, No. 1:09-cv-677-AJB, 2010 WL 3655857, at *9 (N.D. Ga. Sept. 3, 2010) (Baverman, M.J.); *see also Pettus v. Astrue*, 226 Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007) (per curiam) (citing *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  Additionally, "a valid IQ score need not be conclusive of [intellectual disability] where the score is inconsistent with other evidence in the record on the claimant's daily activities and behavior."  *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992); *accord Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 (11th Cir. Aug. 10, 2006).

As discussed in the section immediately above, the ALJ's rejection of IQ scores in the intellectual-disability range and her evaluation of the medical opinions giving rise to her conclusions about Plaintiff's adaptive functioning and limitations in his ability to work appear to be based at least in part on impermissible lay interpretations of the medical evidence and unsupported presumptions about Plaintiff's activities.  *See supra* Part VI.C.  Thus, upon remand, the ALJ should also reexamine whether Plaintiff's impairments meet Listing 12.05C.

48

### E.    Available Work

Plaintiff argues that the ALJ erred in determining that there was work available to Plaintiff other than his past work as a laborer, as the ALJ's determination relied on VE testimony given in response to a hypothetical question that was less restrictive than the ALJ's RFC finding.  [Doc. 12 at 17-19].  Plaintiff also contends that to the extent the ALJ's decision may be read to have concluded that he is capable of returning to his past work as a laborer, that conclusion is not supported by substantial evidence because the VE testimony upon which the ALJ relied did not take into account Plaintiff's need to be limited to no more than casual contact with a supervisor.[13]  [*Id*. at 16-17].

The Commissioner concedes that the VE's testimony revealed that the three jobs identified for step-five purposes—buckle-wire inserter, racker, and box bender—require more than casual contact with a supervisor; that the jobs therefore fall outside the scope of the RFC; and thus that the Commissioner cannot dispute Plaintiff's allegation that the ALJ did not identify sufficient examples of "other work" that is

---

[13]     Plaintiff also again argues that the VE testimony is unreliable because the RFC and hypothetical question posed to the VE did not accommodate Plaintiff's limitations in concentration, persistence, and pace.  [Doc. 12 at 17].  As discussed above, the RFC and the hypothetical question posed to the VE both included limitations to simple, routine, repetitive work tasks; low-stress work; and work that is not fast-paced production work.  *See supra* Part VI.B.  Accordingly, the undersigned finds no such error in the ALJ's determination that Plaintiff was capable of working as a laborer.

AO 72A
(Rev.8/8
2)

available in significant numbers in the national economy.   [Doc. 17 at 24 n.9].

Consequently, even if the Court had found the RFC to be the result of the application

of proper legal principles and supported by substantial evidence, the ALJ's decision

could be upheld only on the basis that the ALJ properly found that Plaintiff was capable

of returning to his past work as a laborer as he performed it or that he was capable of

working as a laborer, as that occupation is defined in the *Dictionary of Occupational

Titles* ("*DOT*").  *See Jackson v. Bowen*, 801 F.2d 1291, 1293-94 (11th Cir. 1986).

       The Commissioner contends that the ALJ properly relied on the testimony of the

VE to find that Plaintiff was capable of returning to work as a laborer, as that

occupation is defined in the *DOT*.   [Doc. 17 at 21-24].   The Court finds the

Commissioner's arguments unavailing for two reasons.

       First, it does not appear that the ALJ in fact determined that Plaintiff was capable

of returning to work as a laborer.  Although the ALJ's decision included a finding that

Plaintiff "may be capable of performing past relevant work as a laborer," the ALJ also

expressed concern that Plaintiff's past relevant work might require work around

hazards and that it might therefore be precluded by the residual functional capacity, and

ultimately, she concluded that Plaintiff was "*unable* to perform his past relevant work."

[R25-26 (emphasis added)].  While it is true, as the Commissioner argues, that the RFC

50

did not include a limitation from working around hazards, [R19], Plaintiff's testimony that he had been prescribed benztropine—a drug typically prescribed to calm muscle spasms—suggests that the ALJ may have intended to include such a restriction in the RFC but neglected to do so, *see supra* n.5.[14]

Second, even presuming that the RFC is correct, the finding as to Plaintiff's ability to return to work as a laborer is unsupported by substantial evidence and therefore separately provides grounds for remand.    During the hearing before the ALJ, the VE identified Plaintiff's past work as falling within the *DOT*'s definition of "laborer" and testified that a person of Plaintiff's age, education, and work experience, who is limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements and involving only simple work-related decisions, with few, if any, workplace changes, and is capable of only occasional, casual interaction with the public, coworkers, and supervisors, could perform work as a laborer, or alternatively, as a buckle-wire inserter, racker, or box bender.  [R53-55].

---

[14]    Even if there were no evidence to support an allegation that Plaintiff should be restricted from work around hazards, and any error arising from discussion of hazards would therefore arguably be harmless, the inclusion of an apparently irrelevant and baseless discussion calls into question whether the ALJ properly considered Plaintiff's limitations when crafting the RFC or considering his ability to perform his past work.

AO 72A
(Rev.8/8
2)

The ALJ then posed a second hypothetical in which she further limited Plaintiff's interaction with supervisors to "rare interaction"—the degree appearing in the RFC—and asked the VE whether the three alternative jobs fell within the new hypothetical, but did *not* ask the VE whether the laborer occupation fell within the new hypothetical.  [R55; *see also* R19 (RFC)].  It thus does not appear that there is substantial evidence to support a determination that the job of "laborer" requires only "rare interaction" with supervisors and that Plaintiff is therefore capable of working as a laborer.  Accordingly, regardless of whether the ALJ's review of the evidence results in an amended RFC, it will be necessary for the ALJ to solicit further vocational evidence upon remand.

## VII.   CONCLUSION

For the reasons above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED**, this the 23rd day of September, 2015.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)